**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DUSTIN BAIN and T.B. *by his father and natural*
*guardian*,

                              Plaintiffs,

        - against -

TOWN OF HEMPSTEAD and TOWN OF
HEMPSTEAD ANIMAL SHELTHER,

                              Defendants.
-----------------------------------------------------------X
TOWN OF HEMPSTEAD,

                              Third-Party Plaintiff,

        - against -

A FURR-EVER HOME, INC., LUCRECIA
SKELLENGER, SHAWN BARROWS, and
JOYCE BARROWS,

                              Third-Party Defendants.
-----------------------------------------------------------X

                              **MEMORANDUM**
                              **AND ORDER**

                              CV 17-6554 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.    PRELIMINARY STATEMENT**

        Plaintiffs T.B., a minor, and his father and natural guardian, Dustin Bain,[1] commenced

this action against the Town of Hempstead (the "Town") and the Town of Hempstead Animal

Shelter (the "Town Animal Shelter") (collectively, the "Defendants").  *See generally* Amended

Complaint ("Am. Compl.") [DE 22].  The Amended Complaint alleges that an American

Bulldog named "Monte," who had a history of aggression towards children and other dogs, was

surrendered to the Town Animal Shelter.  The Town Animal Shelter placed Monte with a rescue

---

[1]        Although there are two named Plaintiffs, when the Court refers to a singular
"Plaintiff," the Court is referring to the minor Plaintiff T.B.

home in Pennsylvania without disclosing Monte's history of aggression.  The Pennsylvania rescue home then facilitated Monte's adoption with T.B.'s grandparents in West Virginia.  While T.B. was at a family gathering with his grandparents and Monte, Monte bit T.B. in the face. Plaintiffs assert three causes of action and seek to hold both Defendants liable for T.B.'s injuries pursuant to theories of strict liability and negligence.  They also seek to hold the Town liable under a theory of  respondeat superior.

The parties in this action have consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  *See* DE 10-11. Presently before the Court is Defendants' motion for summary judgment on all three claims asserted by Plaintiffs.  *See generally* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' Mem.") [DE 36-2]; Defendants' Reply Memorandum of Law in Further Support of Motion for Summary Judgment ("Defs.' Reply") [DE 37].  Plaintiffs oppose the motion.  *See generally* Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment ("Pls.' Opp'n") [DE 40].  For the reasons which follow, Defendants' motion for summary judgment is GRANTED.

II.   BACKGROUND

A.   **Deficiencies in Plaintiffs' Opposition**

As a preliminary matter, Defendants argue that Plaintiffs failed to properly respond to Defendants' Rule 56.1 statement and, as a result, Defendants' asserted facts should be deemed admitted.  Defs.' Reply at 1.  Local Civil Rule 56.1(a) provides that "[u]pon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.

Failure to submit such a statement may constitute grounds for denial of the motion."  Local Civil Rule 56.1(b) provides that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

Although the moving Defendants complied with Local Rule 56.1(a) and submitted a statement of undisputed facts, Plaintiffs have not complied with Local Rule 56.1(b).  *See* Defendants' Rule 56.1 Statement of Material Facts ("Defs.' SOMF") [DE 36-1].  Plaintiffs submitted a "Counter Statement of Facts" which appears to be Plaintiffs' own recitation of the facts and does not correspond with any of the paragraphs of Defendants' Rule 56.1(a) statement. Nor does Plaintiffs' submission address or respond to any of Defendants' numbered paragraphs. *See generally* Plaintiffs' Counter Statement of Facts ("Pls.' CSOF") [DE 39].  Defendants then filed a reply statement of facts which appended the Plaintiffs' purported 56.1 statement to their own to maintain consecutively numbered paragraphs.  Defendants then responded to each of Plaintiffs' assertions.  Defendants' Reply Statement of Material Facts ("Defs.' Reply SOMF") [DE 37-1].

The failure of Plaintiffs' counsel to comply with the E.D.N.Y. Local Rules, and particularly Rule 56.1, is regrettable considering "the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, and 'to assist the court in determining which facts are genuinely undisputed.'"  *NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, No. 07 CIV. 3378, 2007 WL 4233008, at *1 (S.D.N.Y. Nov. 30, 2007) (quoting *Madison Maidens, Inc. v. Am. Mfrs. Mut. Ins. Co.,* No. 05 Civ. 4584, 2006

3

WL 1650689, at *2 (S.D.N.Y. June 15, 2006)).  Local Civil Rule 56.1(c) is clear that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party *will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party*." (emphasis added).  There is no ambiguity in this provision. "Where the opposing party fails to provide a separate statement containing factual assertions, the Court is free to disregard any assertions made by the opposing party."  *Myers v. Lennar Corp.*, No. 08-CV-2799 (JFB) (WDW), 2010 WL 5491112, at *1 n.1 (E.D.N.Y. Dec. 30, 2010) (citing *Watt v. New York Botanical Garden*, No. 98 Civ. 1095 (BSJ), 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000)).  However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citing *Wight v. Bankamerica Corp.*, 219 F.3d 79, 85 (2d Cir. 2000)).

As a result of the failures of Plaintiffs' counsel, the Court conducted its own independent review of the record as well as the parties' competing 56.1 Statements and the exhibits which each side has submitted.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (holding that a district court may "opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file [ ] a statement [of fact]") (quoting *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir. 2000)).  From these documents, the Court references what it considers to be the undisputed facts -- those which are uncontroverted by admissible evidence.  The Court will construe these facts in the light most favorable to the Plaintiffs as the non-moving party.  *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Capobianco v. New York*, 422

F.3d 47, 50 (2d Cir. 2001); *Coastal Pipeline Prod. of New York v. Gonzales*, No. 04 CIV. 8252, 2006 WL 473883, at *4 (S.D.N.Y. Feb. 28, 2006).

### B.   The Undisputed Facts

Defendant Town of Hempstead is a municipal corporation with its main office in Hempstead, New York.   Defs.' SOMF ¶ 4.  The Town Animal Shelter is located in Wantagh, New York, and is an agency of the Town.  *Id.* ¶¶ 5, 13.  "The Town owns, operates, and controls the employees and operations of the Town Animal Shelter."  *Id.* ¶ 13.  Monte is an American Bulldog who was surrendered to the Town Animal Shelter to be euthanized on February 25, 2015 by Reinaldo Pizzaro.  *Id.* ¶¶ 7, 14, 76; *See* Declaration of Joseph E. Macy, Esq. in Support of Motion for Summary Judgment ("Macy Decl.") [DE 36-3], Ex. C ("Pet Point Notes," bates stamped TOH/Bain.1299); Declaration of Adam J. Roth, Esq. in Opposition to Motion for Summary Judgment ("Roth Decl.") [DE 38], Ex. 1 ("Pet Point Notes" bates stamped TOH/Bain.046).  When Monte was surrendered, Pizzaro "provided conflicting responses to the questions on the K-9 Admission Form."  *Id.* ¶ 15.  He indicated that Monte lived with him for two to three years, was housetrained, crate-trained, knew most of his commands, and previously attempted escape.  *Id.* ¶ 16.  Pizzaro stated "he cannot trust [Monte] around his 4 month-old child," that Monte "guards his chewies/bones and toys," showed aggression towards his two children when either of them attempted "to correct Monte from doing something wrong," and bit "his older son about 3-4 months ago."  *Id.* ¶ 17.  In addition, Pizzaro positively indicated that Monte was "active, playful, affectionate, needy (separation issues), and well-behaved," friendly and playful around children and strangers, and "gets along with other dogs."  *Id.* ¶ 18.

On March 5, 2015, the Town Animal Shelter had Monte evaluated by an animal behaviorist.  *Id.* ¶ 19.  The behaviorist reported that Monte mildly guards his food, is social and

not playful with dogs, "was intense (but did not escalate) with chewies and food interference," snapped at a baby doll, and growled and snapped at another dog." *Id.* ¶ 20.

"Special adoption" is a category for an animal that is not just a regular adoption, but has a behavioral or medical issue. Defs.' Reply SOMF ¶ 102. On March 5, Monte was designated as a "special adoption" in the Town Animal Shelter's PetPoint system. However, within 18 seconds, Monte was re-designated as a normal adoption. Pls.' CSOF ¶¶ 16-17; Defs.' Reply SOMF ¶ 90. Months later, one of the defendants' employees stated that Monte should again be designated as a special adoption. Pls.' CSOF ¶ 29.

On March 11, 2015, the Town Animal Shelter issued a written "plea" regarding Monte. *Id.* ¶ 21. A "plea" is posted via Facebook or email to entice potential adopters or rescue agencies to select an animal from the Town Animal Shelter. *See id.* ¶ 22. Monte's plea contained the animal behaviorist's report and stated:

> Monte - our gorgeous American Bulldog is here, and waiting for a home! Monte was surrendered to us so we have a lot of information to share with you! Monte is house trained, crate trained, and knows the commands "sit" and "down". Monte lived in an active home with children of all ages. They described Monte as active, playful, affectionate, needy and well behaved. They said he is friendly and tolerant with strangers and kids. They did also tell us that Monte can have some resource guarding issues, so he is best suited for a home with adults only. Monte is accustomed to all sorts of grooming, and is afraid of vacuums and brooms (so don't expect Monte to help you clean the house!) Monte is great with dogs, and scared of cats (he used to live with two dogs). It seems to be that the reason Monte was surrendered was because the young kid in the home would go to correct Monte if he was doing something wrong, and Monte reacted. But they did say he loves kids, so with the right owner, we know Monte will be an amazing pet. If you are an adult household, even with other dogs, please consider Monte today!

*Id.* ¶ 23. This plea was reproduced on May 13, 2015 which added "Monte has had a lot of interest, but still has no adopter or rescue…! We are also filling up on space." *Id.* ¶ 24.

6

From March 2015 through July 2015, applications to adopt or foster Monte were "consistently denied by Animal Shelter personnel because Monte would not be a good candidate for a home with young children or other dogs." *Id.* ¶ 25. The reason each application was denied was stated in "the Pet Point Notes" provided to each potential adopter/foster. *Id.* ¶ 26. Although the Defendants do not specifically go through each application in their Rule 56.1 Statement, the Plaintiffs listed a number of instances in their Counter Statement of Facts, which Defendants did not dispute, where the Town Animal Shelter rejected applications for the reasons stated by Defendants, *i.e.*, because Monte was not appropriate at a home that had young children and/or other dogs. *See id.* ¶¶ 92-94, 97, 99. During this time frame, on May 5, 2015, Monte attempted to bite one of Defendants' employees. Defs.' Reply CSOF ¶ 95. Defendants' PetPoint System also indicated on May 21, 2015 that "it would be alright" for Monte to have "meet and greets" with other dogs. *See* Macy Decl., Ex. C ("Pet Point Notes," bates stamped TOH/Bain.1299); Roth Decl., Ex. 1 ("Pet Point Notes" bates stamped TOH/Bain.046).

After a potential placement for Monte fell through, the Town Animal Shelter posted a third plea on June 24, 2015 which contained the same information as the prior pleas. Defs.' SOMF ¶¶ 28-29. Two days later, the Town Animal Shelter was contacted about Monte by "A Furr-Ever Home, Inc." a/k/a "Furr-Ever Rescue," a rescue organization operating in Pennsylvania, and its co-owner and administrator, Lucrecia Skellenger. *Id.* ¶¶ 10-11, 30. Skellenger submitted a complete "Town of Hempstead Placement Partnership Application and Agreement," referred to as a "Rescue Application." *Id.* ¶ 30. The Rescue Applications are reviewed by Emily Tanen ("Tanen"), the Rescue Coordinator for the Town Animal Shelter, who coordinates the transfer of animals out of the Town Animal Shelter. ¶¶ 9, 31. As required by the Rescue Application, Furr-Ever Rescue and Skellenger provided the Town with "(i) organization

formation and member information; (ii) the types of rescues that they perform (*i.e.*, species, breed, medical fosters); (iii) veterinarian and current adopter/foster references; and (iv) the locations for all shelters, foster homes, and boarding facilities utilized." *Id.* ¶ 32. The Rescue Application includes "Placement Partnership Terms and Conditions," to which Skellenger and Furr-Ever Rescue agreed. *See* Macy Decl., Ex. F ("Town of Hempstead Placement Partnership Application Agreement") [DE 36-9] at TOH/Bain.006-11. Among other things, these terms and conditions provide that:

> 1. [Furr-Ever Rescue] assumes full responsibility for the animal for the time it is within [Furr-Ever Rescue's] possession, and that the Town of Hempstead Animal Shelter is placing the animal with [Furr-Ever Rescue] based on this condition. . . .

> \* \* \* \*

> 9. [Furr-Ever Rescue] is fully aware that the Town Of Hempstead Animal Shelter makes no guarantees whatsoever as to the animal's health (which includes, but is not limited to congenital, inherited or developmental defects), temperament, mental disposition or training. [Furr-Ever Rescue] agrees to immediately assume all responsibility for the care and safety of the animal, which includes but is not limited to all veterinary treatment and expenses.

> 10. [Furr-Ever Rescue] hereby fully and completely releases the Town Of Hempstead, it agents, servants and employees from any defects or illnesses the animal may have or develop and from any claim, cause of action or liability for any injury or damage to persons or property which may be caused by the animal and to indemnify and hold the Town Of Hempstead harmless against all claims, including but not limited to, those asserted by third persons, for any injury or damage to persons or property cause by the animal.

> \* \* \* \*

> 14. The laws of the State of New York shall govern this Agreement.

> 15. This Agreement contains no express or implied warranties of merchantability or express or implied warranties that the animal as, but not limited to the animal's health, wellness, or behavior.

*See* Defs.' SOMF ¶ 33; Macy Decl., Ex. F at TOH/Bain.006-11.  Between June 30 and July 15, 2015, Rescue Coordinator Tanen placed the Rescue Application on hold pending the submission of additional information from Furr-Ever Rescue and Skellenger.  That information was ultimately provided.  *See* Defs.' SOMF ¶¶ 34-35.  While this application was pending approval, another individual, William Hilty, submitted an application on July 15, 2015 to foster Monte.  *Id.* ¶ 42.  Hilty already had a dog, and following a "meet and greet" with Monte and that dog, Hilty's application to foster Monte was approved on July 19, 2020.  *Id.* ¶ 43.  However, Hilty returned Monte to the Town Animal Shelter on July 25, 2015 because Monte attempted to bite Hilty's other dog and Hilty's wife did not know if she "would be able to handle [Monte] in another situation like this."  *Id.* ¶ 44; Roth Decl., Ex. 1 at TOH/Bain. 043.  Hilty completed a "K-9 Admission Form" and noted that in addition to not getting along with and attempted to bite his family dog, Monte was friendly with children and strangers, showed no signs of resource guarding, never showed aggression to a person, and did not bite anyone in the preceding 10 days.  Defs.' SOMF ¶ 45.

When the Town Animal Shelter works with a rescue agency, its pattern and practice is to provide "all known information about the animal," "including but not limited to, prior attacks, vicious propensities, and medical history," in order to give the agency "a better concept for how to handle that dog."  *Id.* ¶ 36.  This information is typically relayed through verbal communication, email, or both.  *Id.* ¶ 37.  On July 25, 2015, Tanen contacted Furr-Ever Rescue and informed its representative that Monte was returned due to an incident with another dog in the home, but was otherwise "great apparently."  *Id.* ¶ 46.  Prior to Hilty fostering Monte, Skellenger informed Tanen on July 13, 2015 that there was an older couple in West Virginia who had adopted from Furr-Ever in the past and were interested in adopting Monte.  *Id.* ¶¶ 39-41.

9

This couple had no children, but did have two Mastiffs, and a fenced yard. *Id.* ¶¶ 39-41. After Tanen notified Furr-Ever that Monte was returned because of the incident with Hilty's dog, Tanen was informed that the couple in West Virginia still wanted to adopt Monte. *Id.* ¶ 47. Tanen agreed to hold Monte until July 31, 2015 and provided Hilty's K9 Admission Form to Skellenger at Furr-Ever and Tina Underwood at SAFE, another rescue organization involved with Monte's placement. *Id.* ¶¶ 34, 48.

On July 29, 2015, Tanen contacted Skellenger to confirm that the West Virginia couple's adoptive home "is the one for Monte" because they had two dogs and Monte was returned to the Town Animal Shelter for going after dogs in the foster home. *Id.* ¶ 49. Skellenger replied that the adoptive family is an older couple who had dogs their whole life and were experienced handlers. Both of their dogs were female, not aggressive and very submissive, and Skellenger did not believe that territory would be a problem because the couple had a big yard. *Id.* ¶ 50. Skellenger also noted that Monte might not have been properly introduced to other dogs and that he would be picked up by a third-party volunteer transporter on Furr-Ever's behalf. *Id.* ¶ 52. Tanen advised Skellenger to remind the adopter "to go EXTRA slow with him and do not trust him prematurely" as "that is usually where things go wrong. Hopefully they know how to crate him when they are out, etc. . . (sorry, I'm just nervous!)." *Id.* ¶ 53. Skellenger told Tanen that she would talk to the adopters and make them aware of her concerns. *Id.* ¶ 54. Skellenger also assured Tanen that if an issue arose with Monte in West Virginia that Furr-Ever would take back ownership of Monte and find him another appropriate home. *Id.* ¶ 55.

Once a rescue agency's application is approved, the agency takes responsibility for the animal and will place the animal where they think it should go. *Id.* ¶ 51. On July 31, 2015, a "transfer out contract," which reiterates the terms of the Rescue Application, was executed and

Furr-Ever took possession of Monte.  *Id.* ¶¶ 56-57.  Skellenger communicated to Tanen that Monte was doing great and would spend the night at her home before she drove him to West Virginia the next day.  *Id.* ¶ 58.  Tanen again implored Skellenger to "Please please stress to the adopters that they MUST GO SLOW.  There are some people here who are very nervous!"  *Id.* ¶ 59.

Shawn Barrows and Joyce Barrows are the West Virginia couple who adopted Monte. *Id.* ¶ 12.  They are also Plaintiff T.B.'s grandparents (the "Grandparents").  *Id.*  On August 1, 2015, Shawn Barrows received a call to pick up Monte.  *Id.* ¶ 63; *see* August 18, 2018 Transcript of Deposition of Dustin Bain ("Bain Tr.") [DE 36-28], annexed as Ex. Y to Macy Decl. at 33. Minor Plaintiff T.B., a West Virginia resident,[2] and other children were visiting with the Grandparents that day.  Defs.' SOMF ¶¶ 62, 64. After Mr. Barrows arrived home with Monte, the children were asked "to come over and slowly walk up to [Monte] [] to make sure everything was good, . . . and [to] pet him."  *Id.* ¶ 64.  At this time, Monte was restrained by a leash and Mr. Barrow's hand was on his collar; Monte was not reacting  or growling at the children.  *Id.* ¶ 65. Then, Plaintiff T.B., the Grandparents, and other family members, along with Monte "loaded into a pickup truck" and traveled to the home of Plaintiff's Uncle Kristopher to "drink beer, start a fire, and catch up."  *Id.* ¶¶ 66-67.  After their arrival, Monte was tied to the back of the pickup truck with a ten-foot long fixed leash.  *Id.* ¶ 69.  Monte barked and lunged at another dog, so Mr. Barrows attempted to calm him down.  *Id.* ¶ 68.  Within twenty minutes of arriving at Uncle Kristopher's, Monte bit T.B, who sustained injuries to the right side of his face.  *Id.* ¶¶ 70-71; *see* August 18, 2018 Transcript of Deposition of Minor Plaintiff D. B. ("D.B. Tr.") [DE 36-27],

---

[2]     Plaintiff Dustin Bain is also a West Virginia resident.

annexed as Ex. X to Macy Decl. at 55.  The Grandparents then returned Monte to either "Skellenger/Furr-Ever" or "Underwood/SAFE."  Defs.' SOMF ¶ 72.

### C.    Relevant Procedural Background

This action was commenced on November 9, 2017 by the filing of the Complaint.  DE 1. On November 14, 2017, the case was assigned to District Judge Arthur Spatt and the undersigned.  On January 10, 2018, counsel consented to the jurisdiction of a United States Magistrate Judge for all purposes and Judge Spatt "so ordered" the consent form the next day. DE 10, 11.  Defendants filed their Answer on January 17, 2018.  DE 12.  Defendants also filed a Third-Party Complaint against Furr-Ever Home, Skellenger, and T.B.'s Grandparents on January 24, 2018.  DE 13.  None of these third-party defendants filed an answer or otherwise responded to the Third-Party Complaint.  Defendants requested certificates of default for Skellenger and Furr-Ever Home on August 31, 2018, but later moved to withdraw that request after realizing that service was not properly effected pursuant to Pennsylvania law.  DE 29, 30. The Court granted the motion to withdraw the requested certificates of default on September 18, 2018.  *See* September 18, 2018 Electronic Order.

The Court held an Initial Conference on April 16, 2018.  DE 17.  On April 24, 2018, Plaintiffs filed a stipulation to amend the caption of this case to list the minor plaintiff by initials only.  *See* DE 21.  In response to this stipulation, the Court pointed out that even if the caption was amended, the Complaint itself still contained the minor's full name.  May 2, 2018 Electronic Order.  As such, the Court directed counsel to submit an amended complaint.  *Id.*  Plaintiffs filed an Amended Complaint on May 3, 2018.  *See* DE 22.  Defendants filed their Answer on May 9, 2018.  DE 24.

The Court held a Discovery Status Conference on October 2, 2018.  *See* October 2, 2018 Civil Conference Minute Order [DE 34].  At that time, Defendants' counsel indicated that he intended to withdraw the third-party action.  *Id.* ¶ 1.  After a discussion with counsel, the Court agreed to bifurcate the liability aspect of this case from the damages portion.  A briefing schedule was set for summary judgment motion practice after the fact depositions were completed.  *Id.* ¶ 4.  Defendants' fully briefed summary judgment motion was filed on March 8, 2019.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party.  *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).  In dispatching this task, a court need only consider admissible evidence.  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *Hilaire*, 54 F. Supp. 3d at 251.

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact."

*Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273; *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims." (internal quotation marks omitted)).

## IV.   DISCUSSION

Plaintiffs three causes of action in the Amended Complaint against the municipal defendants are based on state law: (1) strict liability; (2) negligence; and (3) respondeat superior. The first two counts are against both Defendants whereas the third count is lodged solely against the Town. The Court's inquiry will focus on whether there exists a genuine dispute as to the material facts concerning these claims.

### A.   Strict Liability

In New York, "the owner of a domestic animal who either knows or should have known of that animal's vicious propensities will be held liable for the harm the animal causes as a result of

those propensities." *Abrahams ex rel. Reid v. City of Mount Vernon*, 152 A.D. 3d 632, 633, 59

N.Y.S. 3d 399, 401 (2d Dep't 2017) (quoting *Collier v. Zambito*, 1 N.Y. 3d 444, 446  (2004)).

Once this knowledge is established, the owner faces strict liability.  *Id.*

> If such animal be delivered [by the owner] to another, he [or she]
> must inform such person of the animal's vicious characteristics, so
> far as known, or ascertainable by the exercise of reasonable care.  If
> such information be given, or the person to whom the animal is
> delivered knows, or before injury ascertains, the vicious character
> of the animal, the owner is not liable.

*Tighe v. N. Shore Animal League Am.*, 142 A.D.3d 607, 608-09, 36 N.Y.S.3d 500, 502 (2d Dep't

2016) (alteration in original) (citing *Hosmer v. Carney*, 228 N.Y. 73, 75, 126 N.E. 650, 650

(1920)).  "The rationale for such rule is self-evident—informing a person who takes possession

of an animal about the animal's vicious propensities allows that person to take precautionary

measures to protect himself or herself and others from harm caused by that animal's vicious

propensities."  *Id.*

Defendants' motion for summary judgment as to Plaintiffs' strict liability claim asserts

that (1) Defendants did not "own" Monte at the time the minor T.B. was bitten and cannot be

held liable for any of his injuries, and (2) Furr-Ever Rescue was adequately advised of Monte's

vicious propensities.  Defs.' Mem. at 9, 12.  As to the first argument, Defendants do not dispute

that "as of the morning of July 31, 2015, the Town owned, possessed, harbored, and exercised

dominion and control over Monte."  Defs.' Mem. at 10.  However, Defendants' maintain that (1)

their "ownership" of Monte ceased later that day when the "transfer out contract" between the

Town and Furr-Ever was executed, and (2) Plaintiffs have submitted no evidence to contradict

this information.  As stated in the "terms and conditions" of the Rescue Application, the "transfer

out contract" also states that Furr-Ever "assumes full responsibility for the animal" while it is in

its possession, and the Court finds that the Town placed Monte with Furr-Ever based on this

condition.  *See* Macy Decl., Ex. F ("Rescue Application Terms and Conditions") [DE 36-9] at 5,

¶ 1; Macy Decl., Ex. V ("Transfer Out Contract") [DE 36-25] at 1.  The chain of Monte's

ownership does not end there, however.  Plaintiff's Grandparents then adopted Monte from Furr-

Ever and became Monte's owners.  While Monte was in their possession, he bit T.B.  *See*

*Marilyn v. Haven*, No. 108894/09, 2012 WL 692038, at *8 (N.Y. Sup. Ct. Feb. 21, 2012) (stating

that New York courts have held that a person who adopts a dog to be the dog's "owner"), *aff'd*,

*Franklin v. Animal Haven, Inc.*, 107 A.D. 3d 574, 967 N.Y.S. 2d 370 (1st Dep't 2013); *Bernstein*

*v. Penny-Whistle Toys, Inc.,* 40 A.D.3d 224, 224-26, 834 N.Y.S.2d 173 (1st Dep't 2007); *see*

*also D.C. ex rel. Christian v, Petco Animal Supplies Stores, Inc.,* Index No. 1670/06, 16 Misc.3d

1114(A), 2007 N.Y. Slip Op 51413(U) (Sup. Ct. Nassau County July 16, 2007), *aff'd,* 54 A.D.3d

707, 863 N.Y.S.2d 756 (2d Dep't 2008) (describing defendant who adopted a Rottweiler ten days

prior to biting incident as "dog owner").  Neither the Town nor the Town Animal Shelter owned

Monte at the time of the biting incident on August 1, 2015 because any ownership interest they

had in Monte ceased on July 31, 2015.  Consequently, the Defendants are not proper parties to

this lawsuit.  They cannot be held strictly liable for the dog-biting incident which occurred after

the dog was transferred from the Town Animal Shelter to Furr-Ever Rescue and was adopted by

Plaintiff's Grandparents.  *See Frank*, 107 A.D. 3d at 574-75, 967 N.Y.S. 2d at 371; *Marilyn*,

2012 WL 692038, at *8-9.  Since Defendants cannot be held liable to Plaintiffs for Monte's

attack on T.B., the Court need not reach the second component of strict liability involving the

issue of whether Defendants adequately advised Furr-Ever Rescue of Monte's vicious

propensities. *Marilyn*, 2012 WL 692038, at *9. Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claim for strict liability.[3]

### B.      Negligence

"New York does not recognize a common-law negligence cause of action to recover damages for injuries caused by a domestic animal." *Abrahams*, 152 A.D.3d at 633, 59 N.Y.S.3d at 400 (quoting *Lew v. Stratigakis,* 135 A.D.3d 832, 832, 23 N.Y.S.3d 326, 327 (App. Div. 2016)). In *Abrahams*, the court held that because a city's act of providing an animal shelter was a government function, it cannot be held liable for damages caused by a dog in its care "absent the existence of a special relationship between it and the plaintiffs giving rise to a special duty of care." *Id.* at 634, 59 N.Y.S.3d at 401. A special relationship can be created in three ways: "(1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation." *Id.* (quoting *McLean v. City of New York,* 12 N.Y.3d 194, 199 (2009)). It is not disputed that the Town owns, operates, and controls the Town Animal Shelter pursuant to a statutory mandate, and, thus, the Shelter's

---

[3]      The Court notes that there is conflicting information in the record as to whether Tanen adequately advised Skellenger of Monte's aggression towards children and adults, beyond Monte's history of "going after" other dogs. For example, Plaintiff submitted a declaration by Skellenger, in which she states, under penalty of perjury, that she was never told Monte should not be around children or that he was aggressive towards humans. *See* Declaration of Lucrecia Skellenger ("Skellenger Decl."), annexed as Ex. 3 to Roth Decl. [DE 38-3]. Meanwhile, Defendants have submitted deposition testimony from Emily Tanen in which she states that if she did not email owner surrender notes or PetPoint notes to Skellenger, Tanen "must have" communicated such information over the phone. *See* November 13, 2018 Transcript of Deposition of Emily Tanen ("Tanen Tr.") [DE 36-30], annexed as Ex. AA to Macy Decl. at 18-19. However, these issues do not necessitate resolution because the Court has already dismissed Plaintiff's strict liability claim on other grounds.

operation constitutes a government function.  *See* Defs.' Mem. at 15.  The Court's inquiry will

therefore focus on whether there is a genuine dispute of material fact as to the existence of a

special relationship between Plaintiffs and Defendants.

Turning to the parties' arguments, Defendants' position is four-pronged: (1) Plaintiff does

not even allege that Defendants violated any statutory duty running to him; (2) there is no

evidence to establish that Defendants owed Plaintiff a duty and breached that duty; (3)

Defendants never assumed a voluntary duty to Plaintiff; and (4) the Town did not affirmatively

act and put Plaintiff in harm's way.  Defs.' Mem. at 17-18.  In response, Plaintiff's argument

appears to conflate the different types of special relationships set forth above with the

assumption-of-duty doctrine that is applicable to ordinary negligence claims.  First, Plaintiff

contends that under Town regulations, when a dog is brought in by an owner to be euthanized,

there is no discretion for Town employees to "deviate from an Owner requested euthanasia."  *Id.*

at 9.  (The Court notes that this "regulation" is attached to Plaintiffs' opposition and is actually

part of the Town's "Euthanasia Policy and Procedure."  *See* Roth Decl., Ex. 2 ("Town of

Hempstead Euthanasia Policies") [DE 38-2].)  Plaintiffs alternatively argue that Monte exhibited

three of the four traits that qualify for euthanasia" under the Town's policy -- and because Monte

was not euthanized, the Town "assumed a positive direction and control in the face of a known,

blatant and dangerous safety violation."  Pls.' Opp'n at 9-10.

At the outset, the Court notes that Plaintiffs do not allege in the Amended Complaint the

existence of any type of special relationship.  In fact, it is not until their opposition papers that

Plaintiffs attempt to argue, for the first time, that Defendants "assumed a duty in the face of a

known danger; specifically, keeping Monte even after it was surrendered for euthanasia."  Pls.'

Opp'n at 10.  It is well-settled law that a plaintiff cannot amend pleadings through opposition

papers. *See Williams v. Black Entm't Television, Inc.*, No. 13-CV-1459, 2014 WL 585419, at

*11 (E.D.N.Y. Feb. 14, 2014) ("Plaintiff cannot amend his pleadings through an opposition

brief."); *Fadem v. Ford Motor Co.,* 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is

longstanding precedent in this circuit that parties cannot amend their pleadings through issues

raised solely in their briefs.").  Notwithstanding this defect, even if the Court were to consider

the merits of Plaintiff's argument, Plaintiff has not met his burden to overcome Defendants'

arguments or raise an issue of material fact.

Here, Plaintiff's statement that the Town Euthanasia Policy Procedure does not provide

any discretion for Town employees to "deviate from an Owner requested euthanasia," *see* Pls.'

Opp'n at 9, is not only inaccurate, but it does not raise a material issue of fact.  The Court does

not interpret Town Policy to require such a mandate of Town employees since the Policy states

"[e]uthanasia decisions are determined by the animal's behavior status and/or medical status."

Town of Hempstead Euthanasia Policies [DE 38-2] at 1.  Defendants have also cited provisions

of the New York State Agricultural and Markets Law and the Town Code which afford the Town

the discretion to humanely destroy or euthanize a surrendered animal as a matter of law.  *See*

Defs.' Reply at 8-9.  As such, the Town Policy, Town Code, and the New York State

Agricultural and Markets Law all indicate that euthanasia decisions are to be made on a case-by-

case basis.

Next, it appears that Plaintiff is attempting to create a material issue of fact by contending

Monte should have been euthanized based on his behavioral history, pursuant to the guidance

offered in the Town Policy.  The Policy provides that an animal will be considered un-adoptable

and appropriate for euthanasia if it demonstrates one or more of the following behaviors:

- Attack or uninhibited bite resulting in injury or death to a human being.
- Any animal that has been determined to have the propensity to injure, kill or harm another domestic animal.
- Any animal that has a history of seriously or fatally injuring another domestic animal.
- Any animal that poses serious and unmanageable risk to shelter employees or a member of the public either during regular handling or during behavior evaluation and/or modification.

Town of Hempstead Euthanasia Policies [DE 38-2] at 1.  Plaintiff submits, without citing any evidence in the record, that Monte exhibited three of these four traits.  Pls.' Opp'n at 9-10.  However, this information is not disputed.  Defendants do not contend that Monte bit his owner's child before he was surrendered to the shelter, that Monte went after other dogs in the shelter, or that Monte tried to attack an employee at the shelter.  *See* Pls.' Opp'n at 9-10; Defs.' Reply SOMF ¶¶ 84, 94, 104.  Moreover, Defendants submitted the transcript of the deposition of Michael Pastore, Director of the Town Animal Shelter.  Pastore explained that "Monte did not meet the criteria of the [Town] euthanization policy" because Monte "was a manageable dog," "walked several times by staff and volunteers," "did not display an unmanageable risk to the staff or to the volunteers," and did not have an "egregious bite history."  November 13, 2018 Transcript of Michael Pastore Deposition ("Pastore Tr.") [DE 36-29], annexed as Ex. Z to Macy Decl. at 10-11.  According to Pastore, "Monte was not even on the radar for euthanizing."  Pastore Tr. at 12.

Here, even if the Town should have euthanized Monte, Defendants would still not be liable to Plaintiffs.

> Liability cannot be imposed simply on the basis of a "but-for" analysis. Before plaintiffs can cast the town into liability to the plaintiffs, they must establish that in violating the code the town breached a duty of care owed to them.  As we have already shown, the code provision was designed for the protection of the general public, and a municipality cannot be held liable for imperfectly

> performing governmental functions designed to protect the public in
> general.

*Browne*, 110 A.D.2d at 107.  In *Browne*, the plaintiff went to the Town of Hempstead Animal

Shelter to adopt a dog and, upon his arrival at the Shelter, saw two men attempting to load a dog

that one of them had just adopted into a car.  *Id.* at 102.  This dog had recently been picked up by

the shelter as a stray after it bit another person.  While on a leash in the Shelter's parking lot, the

dog bit the plaintiff on the nose.  *Id.* at 103.  The court in *Browne* did not find the Town liable for

monetary damages to a third person after custody of the dog was surrendered to the adopting

party.  Rather, the court stated:

> In short, we are not prepared to hold that the town, in discharging its
> governmental duty to maintain a dog pound, in the course of which
> it takes in stray dogs and places them for adoption, is liable for
> monetary damages to a third person bitten by such a dog after
> custody of the dog has been surrendered to the adopting party even
> though the dog has not yet arrived at its new home, but is still in the
> parking lot of the pound.

*Id.* at 108-09.  The plaintiff in *Browne* was injured in the parking of the Town Animal Shelter

just moments after the Town released the dog.  The court noted that the Town did not breach any

duty owed to the plaintiff by releasing the dog for adoption, even if the Town violated the State

Sanitary Code by releasing it prematurely or by not destroying it.  *Id.*   In comparison, the

instant case provides a stronger basis to find that there was no duty of care owed by the

Defendants to Plaintiff – namely, the intermediary Furr-Ever Rescue, which ultimately adopted

out Monte to Plaintiff's' grandparents who were Monte's owners at the time Plaintiff was

attacked.[4]

---

[4]     On October 26, 2020, Plaintiffs' counsel advised the Court of a recent New York
Court of Appeals decision, *Hewitt v. Palmer Veterinary Clinic P.C.*, which counsel
"believes . . . may contribute to this Court's analysis."  DE 41 (citing *Hewitt v. Palmer
Veterinary Clinic, P.C.*, No. 2020 WL 6163313 (N.Y. Oct. 22, 2020)).  Plaintiffs do not
elaborate on their position nor advance an argument as to how *Hewitt* impacts the instant motion.

A bedrock principle of "special relationship" law is that there needs to be a "relationship between the municipality and the class or the individual involved, as well as an element of reliance by that class or individual upon the promised governmental action or protection." *See Browne*, 110 A.D.2d at 106. A plaintiff must demonstrate "more than a violation by the town of a general duty owed to the public at large." *Garrett v. Town of Greece*, 78 A.D.2d 773, 774, 433 N.Y.S.2d 637 (1980), *aff'd sub nom. Garrett v. Town of Greece, New York*, 55 N.Y.2d 774, 431 N.E.2d 971 (1981). Here, the Town policy cited by Plaintiffs contains no language suggesting that it was intended to protect a specific class of persons. *See Browne*, 110 A.D.2d at 106. On the contrary, the Town policy protects the dogs surrendered by owners to the Town Animal Shelter for euthanasia. It does so by providing Town employees with guidance when making

---

Defendants filed a letter in response, arguing that *Hewitt* is not relevant. DE 42. The Court agrees with Defendants. In *Hewitt*, the defendant veterinary clinic performed a procedure on a dog named Vanilla. *Hewitt*, 2020 WL 6163313, at *1. After a veterinarian returned Vanilla to her owner in the clinic's waiting room, Vanilla slipped her collar, jumped at the plaintiff from behind, grabbed her ponytail, and injured her. *Id.* The New York Court of Appeals held that the clinic owed a duty of care to the plaintiff, who was the clinic's client and was injured in the clinic's waiting room:

> [A] veterinarian introduced Vanilla into a purportedly crowded waiting room, where the dog was in close proximity to strangers and their pets—allegedly creating a volatile environment for an animal that had just undergone a medical procedure and may have been in pain. Palmer is in the business of treating animals and employs veterinarians equipped with specialized knowledge and experience concerning animal behavior—who, in turn, may be aware of, or may create, stressors giving rise to a substantial risk of aggressive behavior. With this knowledge, veterinary clinics are uniquely well-equipped to anticipate and guard against the risk of aggressive animal behavior that may occur *in their practices—an environment over which they have substantial control, and which potentially may be designed to mitigate this risk.*

*Id.* at *2-3 (emphasis added). In contrast to the instant case, Plaintiff T.B. was not injured on the premises of the Town Animal Shelter but was bitten by Monte at his Uncle's home, in a different state, after a third-party agency facilitated Monte's adoption.

euthanasia determinations based on behaviors and medical conditions an animal may have, and then certain procedures which are to be followed when an animal is selected to be euthanized. Moreover, Plaintiffs, who are West Virginia residents, have not pointed to any evidence to suggest that they relied in any way on the Town of Hempstead's euthanasia policies and procedures, which is contrary to the case law they have cited.  Thus, as a matter of law, Defendants owed no duty to Plaintiff by keeping Monte after he was surrendered to the Town Animal Shelter for euthanasia.  Consequently, summary judgment is GRANTED as to this claim.

### C.    Respondeat Superior

Plaintiffs' third and final claim is for respondeat superior liability against the Town. "Under the doctrine of *respondeat superior*, an employer can be held vicariously liable for the torts committed by an employee acting within the scope of the employment." *Corbett v. City of New York*, No. 11-CV-03549, 2013 WL 5366397, at *22 (E.D.N.Y. Sept. 24, 2013) (first quoting *Fernandez v. Rustic Inn, Inc.,* 60 A.D.3d 893, 896, 876 N.Y.S.2d 99, 102 (N.Y.A.D. 2 Dept.2009); then citing *Judith M. v. Sisters of Charity Hosp.,* 93 N.Y.2d 932, 933, 693 N.Y.S.2d 67, 68, 715 N.E.2d 95 (N.Y.A.D. 2 Dept.1999).)   "When the doctrine of *respondeat superior* is invoked, it must be shown that the person committing the act was an employee of the party sought to be charged . . . ." *Id.* (quoting N.Y. Jur.2d *Government Tort Liability* § 41 at 479 (2010)) (omission in original).

Plaintiffs dedicate only a portion of one sentence in their opposition to this claim, which states that if Town employees "assumed a duty of care, then the Defendant Town of Hempstead may be found liable under the theory of respondeat superior."  Pls.' Opp'n at 10 (citing *Mirza v. Metro. Life Ins. Co.*, 2 A.D.3d 808, 770 N.Y.S.2d 384 (2003)).  Putting aside the issue of whether the Town Animal Shelter is even a suable entity, Plaintiff's respondeat superior claim is

derivative of his negligence claim, which has already been dismissed by the Court.  In the absence of an underlying tortious wrongdoing, a respondeat superior claim cannot survive. Moreover, Plaintiff does not identify which Town employee committed the type of wrongdoing necessary to warrant the imposition of vicarious liability against the Town because Plaintiff's claim is against both the Town Animal Shelter and the Town at-large.  *See Corbett*, 2013 WL 5366397, at *23 (granting defendants' summary judgment motion on plaintiff's respondeat superior claim because the plaintiff failed "to identify any particular employees" working for the New York City Police Department).  Accordingly, Defendants' motion is GRANTED and Plaintiffs' respondeat superior claim is dismissed.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety.  The Clerk's Office is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
       February 5, 2021

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge